**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ANGELETTE M. EVANS,<br><br>Plaintiff,<br><br>v.<br><br>GOVERNORS STATE UNIVERSITY, DR. BEVERLY SCHNELLER, DR. NING LU, DR. CATHERINE BALTHAZAR,<br><br>Defendants. | Case No. 23-cv-15113<br><br>Judge Martha M. Pacold |

**MEMORANDUM OPINION & ORDER**

Defendants' motion for summary judgment, [77], is granted.[1]

**BACKGROUND**

Before turning to the background, it is necessary to address a preliminary issue. At the summary judgment stage, all disputed facts are construed in the light most favorable to the nonmoving party, here the plaintiff. *Moore v. Vital Prods., Inc.*, 641 F.3d 253, 256 (7th Cir. 2011). Facts are drawn from the parties' Local Rule 56.1 Statements of Facts, and the parties' respective responses, [94-2] and [99], indicate whether a fact is indeed undisputed. Of course, a party simply saying that a fact is disputed does not mean that the dispute is genuine; the party must cite evidence in the record that contradicts the asserted fact. Any facts not properly disputed in compliance with Local Rule 56.1 are deemed admitted. *See Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003). District courts are entitled to "require strict compliance" with Local Rule 56.1 for both a party's asserted facts and the responses to the opposing party's facts. *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009). Therefore, it is within the court's discretion to deem admitted facts not properly disputed or disregard noncompliant asserted facts as appropriate.

Defendants argue that many of plaintiff's responses to defendants' statement of facts are noncompliant and therefore defendants' facts should be deemed admitted. [100] at 5–10. Defendants argue that plaintiff submitted responses that do not

[1] Bracketed numbers refer to docket entries and are followed by page and / or paragraph number citations. Page numbers refer to the CM/ECF page number.

directly contradict the stated fact, lack supporting citations to the record, lack relevance to the legal issues at hand, or do not rely on admissible evidence. *Id*. Upon review of plaintiff's responses, many of defendants' objections appear to be correct, so the court is within its discretion to strike many, if not most, of plaintiff's responses and deem the related defendants' statements true for purposes of this motion. *See Smith*, 321 F.3d at 683. For example, plaintiff routinely responds to defendants' asserted facts by admitting that the reviews contain the relevant information but disputing that defendants' description of her work is correct. *Cf*. [94-2] ¶ 41. Such responses do not create a factual dispute concerning the contents of defendants' evaluations or that defendants honestly believed what they wrote.

That said, the court need not make definitive rulings on many, if not most of defendants' objections. In the interest of resolving the pending motion on the merits rather than on procedural grounds, the court will, in its discretion, address the legal deficiencies in plaintiff's responses only when necessary to resolve whether a particular fact is material and in dispute.

Turning to the factual background (*see generally* [94-2] and [99]):

Plaintiff Angelette M. Evans was a tenure-track professor at Governors State University ("GSU"). GSU employed all the other remaining defendants: Dr. Ning Lu, Dr. Catherine Balthazar, and Dr. Beverly Schneller.[2] Dr. Lu was Chair of the Department of Health Administration and Informatics. Dr. Balthazar was Dean of the College of Health and Human Services. Dr. Schneller was Provost and Vice President for Academic Affairs. All had some role in evaluating plaintiff's performance.

GSU's process for reviewing tenure-track professors' performance is governed by its agreement with the union representing the professors. Under the agreement, tenure-track faculty are evaluated annually to (1) assess their strengths and weaknesses and (2) discern whether they should be retained or promoted. In years 1–3, tenure-track faculty are evaluated by the Department Personnel Committee ("DPC"), the Department Chair, and the Dean. In years 4–6, they are also evaluated by the University Personnel Committee ("UPC"). After this initial review, the Provost's Office and the University President then evaluate whether to retain the faculty member for the following academic year. Tenure-track faculty must meet higher standards each year as part of the review and retention process.

Plaintiff submitted her first retention application in fall 2019. The DPC's first evaluation, in January 2020, found that plaintiff had met the requirements for retention. The DPC still identified ways plaintiff could improve, such as being available, timely, and organized. The DPC also stated that plaintiff would be required to show deliverables, *i.e.* publications, in future applications. Dr. Lu and Dr.

[2] Defendant Dr. Cheryl Green passed away during the course of the litigation. *See* [58].

Balthazar both agreed with the DPC that plaintiff should be retained for the next academic year and each also identified certain areas for improvement, including a focus on research and providing specific evidence identifying her accomplishments. Plaintiff admits that the evaluations and correspondence occurred and contain the specific quotes from the defendants, but disputes the soundness of the reviews. But as mentioned earlier, disputing whether the reviews were sound does not create a dispute about whether the reviews contain the contents that they contain or about whether the reviewers honestly believed their own reviews.

In fall 2020, plaintiff submitted her next retention application. The DPC found several problems with plaintiff's application. In the DPC's review, it noted that plaintiff had failed to submit any "(1) peer-reviewed or juried posters; (2) oral presentations at the local, state, or national level; (3) publications; or (4) proposals for presentations, posters, or grants." [94-2] ¶ 18. The DPC also found that plaintiff had submitted work product that was "inappropriate for consideration" for various reasons. *Id.* Despite these concerns, the DPC found that plaintiff had met the required performance standards and again recommended retention. Dr. Lu exchanged emails with another professor expressing some of her concerns with plaintiff's work and agreeing with the DPC's review. In evaluating plaintiff's retention application, Dr. Lu noted her concerns and expressed feedback so that plaintiff could improve but ultimately concurred with the DPC's recommendation. In her evaluation, Dr. Balthazar agreed with the other evaluations. Dr. Green, then the President of GSU, informed plaintiff that she was being retained and directed plaintiff to "pay close attention to the recommendations offered to you within the review process as you look ahead[.]" *Id.* ¶ 23.

Following these two application processes, in July 2021, plaintiff had a medical condition that required surgery. Plaintiff informed Drs. Balthazar and Lu of the medical condition and requested an accommodation. Dr. Lu told plaintiff to reach out to HR and informed plaintiff that GSU would honor any accommodations or leave time as approved by HR. Plaintiff's medical provider filled out GSU's accommodation request and suggested that GSU allow plaintiff to teach virtually while she was recovering. In August 2021, shortly before classes started, GSU granted plaintiff's accommodation request and adjusted her teaching schedule by reassigning her only remote courses.

Plaintiff had concerns with her new class assignments. The classes were not the same classes she had been scheduled to teach previously, as GSU could not make those classes remote on such short notice. GSU required that classes go through an approval process before they could be taught remotely, and students had already signed up for the classes in person. Plaintiff emailed Dr. Lu regarding her concerns with her new schedule. Dr. Lu again adjusted the courses assigned to plaintiff to include classes that plaintiff had taught before or that had well-developed curricula for online instruction.

Plaintiff still had concerns with her new course assignments and again asked Dr. Lu for additional changes. Dr. Lu eventually declined to make any further changes and suggested that plaintiff should take FMLA leave if necessary. Plaintiff talked to Dr. Balthazar, among others. It was again suggested to plaintiff that she take FMLA leave. Plaintiff decided to take leave. In August 2021, GSU approved plaintiff's request for FMLA leave, which lasted for about three months. Plaintiff did not teach any courses for the remainder of the Fall 2021 semester. When plaintiff returned from leave in November 2021, Dr. Lu instead instructed her to work on research and prepare for her next retention application, which was due in January 2022. GSU had reached an agreement with the union that, due to the COVID pandemic, professors' next retention applications would be evaluated with the same requirements as their previous ones. So, plaintiff was again evaluated under the Year Three guidelines.

Again, the DPC had concerns with plaintiff's application. The DPC found that plaintiff had met the required performance ratings for teaching and service but had not met the required rating for research. The DPC found that two of the items plaintiff submitted did not line up with its criteria for effective research; a letter that plaintiff submitted as proof of her work did not include supporting records or other evidence; a PowerPoint presentation that plaintiff submitted did not represent independent intellectual content; and there was no indication of continuing scholarship, peer reviewed oral presentations, or other proposals for presentations, posters, or grants submitted as evidence of research productivity. [94-2] ¶ 42. Despite these misgivings, the DPC decided to recommend retention because plaintiff had met the criteria for teaching and service.

Plaintiff contends that she was engaged in appropriate research during this evaluation period through the Roseland Initiative, which lasted approximately from June 2020 to September 2021, but defendants incorrectly counted her work as service rather than research. Plaintiff further contends that Dr. Balthazar had informed her that her work on the Roseland Initiative could count as research. [99] ¶¶ 1–3. Nonetheless, whether the Roseland Initiative was better described as research or service, plaintiff was on notice going into the following evaluation cycle that defendants considered the Roseland Initiative to be service rather than research.

The other reviewers disagreed with the DPC's recommendation to retain plaintiff. In her own review, Dr. Lu found that plaintiff's research was not "effective" under GSU's framework. Dr. Lu identified other issues with plaintiff's application, including that several of the letters that plaintiff had submitted in support of her application were from the previous year. So, Dr. Lu decided to recommend against retaining plaintiff for the 2022–2023 academic year. Dr. Balthazar reviewed the other evaluations, concurred with Dr. Lu's evaluations, and also declined to recommend retaining plaintiff. Following GSU's procedures, the UPC reviewed plaintiff's application and all related documents before also recommending not to retain plaintiff.

After the reviewers had completed their work, plaintiff's application and the relevant recommendations were presented to GSU President Green and Provost Schneller. While each had concerns with plaintiff's performance, they were aware of the challenges that the COVID-19 pandemic created for faculty members. As a result, they ultimately decided to retain plaintiff for another academic year.

Plaintiff submitted her next retention application in fall 2022. As mentioned, Year Four had more stringent criteria for retention than the first three years. Though plaintiff argues that she should have been evaluated under the Year Three guidelines instead, she cites no relevant evidence suggesting as much. In fact, none of the evidence she cites in support of her argument addresses the standard under which she should have been evaluated. So plaintiff's application was properly evaluated under the Year Four criteria, based on the undisputed record. *See Smith*, 321 F.3d at 683.

The DPC reviewed plaintiff's application under the Year Four criteria and recommended non-retention. It found that plaintiff did not meet the required performance standards for teaching or for research. Among other things, the DPC found that plaintiff had listed herself as the sole author of a report despite not writing any part of it; submitted the report as evidence of research despite prior warnings that it did not meet the necessary criteria to be considered as such; listed herself as the sole author of a different paper despite being one of eleven authors; failed to submit evidence that the paper was submitted to a publisher; and failed to explain how she was engaged in research relating to a grant that she had already been told was not appropriate evidence of research. [94-2] ¶ 63. Plaintiff does not contest that the report made these criticisms nor cite any evidence showing that she accurately represented her authorship, so those facts are also admitted for the purposes of this motion. *See Smith*, 321 F.3d at 683.

Others concurred. Dr. Lu and Dr. Balthazar each agreed with the DPC's findings and recommended non-retention. The UPC reviewed plaintiff's application, the related evaluations, and plaintiff's reconsideration request, and also recommended non-retention. GSU President Green and Provost Schneller reviewed plaintiff's application, related evaluations, and plaintiff's reconsideration request. They determined that plaintiff had not met the performance standards for Year Four and decided not to retain plaintiff for the following academic year.

While the review process was ongoing, in October 2022, plaintiff requested medical leave again to recover from a second surgery. GSU approved her request in November, and plaintiff's leave began on December 13, 2022. December 13 happened to be the last day that GSU had to notify employees of any non-renewal decisions pursuant to the agreement between GSU and the union. So plaintiff was informed of defendants' decision on the same day she started leave.

Plaintiff, proceeding pro se, brought this lawsuit in 2023. Following discovery, defendants moved for summary judgment. Defendants' motion is fully briefed, [78], [94-1], and [100], and argument was held on the motion on August 20, 2026.

## LEGAL STANDARD

Courts are to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is only genuine "if a reasonable jury could return a verdict for the nonmoving party[.]" *Wayland v. OSF Healthcare Sys.*, 94 F.4th 654, 657 (7th Cir. 2024). The party moving for summary judgment has the burden of proof, and the court construes all disputed facts in the light most favorable to the non-moving party and draws reasonable inferences in that party's favor. *E.g.*, *Ogden v. Atterholt*, 606 F.3d 355, 358 (7th Cir. 2010).

## DISCUSSION

Plaintiff brings four claims: two under the Family Medical Leave Act (FMLA) and two under the Americans with Disabilities Act (ADA).

### I. FMLA

Plaintiff alleges that defendants interfered with her ability to exercise her FMLA rights and that they retaliated against her for exercising her right to take FMLA leave. To establish a FMLA interference claim, plaintiff "must show that: (1) [s]he was eligible for FMLA protections; (2) h[er] employer was covered by the FMLA; (3) [s]he was entitled to take leave under the FMLA; (4) [s]he provided sufficient notice of h[er] intent to take leave; and (5) h[er] employer "interfered with, restrained, or denied FMLA benefits to which [s]he was entitled." *Juday v. FCA US LLC*, 57 F.4th 591, 595 (7th Cir. 2023) (internal quotation marks omitted). Defendants dispute only the last element, that they interfered with plaintiff's FMLA rights. The retaliation claim has different elements. Plaintiff "must show that (1) [s]he engaged in FMLA-protected activity; (2) h[er] employer took an adverse employment action against h[er]; and (3) there is a causal connection between the two." *Id*. at 596. Everyone agrees that plaintiff took leave; the parties dispute whether defendants took an adverse employment action against her because of the leave. Both claims turn on whether defendants failed to adjust their performance expectations in light of plaintiff's leave. *See, e.g.*, *id*. (confirming that the two claims can rise and fall "for the same reason").

FMLA interference could have occurred if the defendants considered plaintiff's taking FMLA leave a "negative factor" in their employment decisions. *Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 818 (7th Cir. 2015) (quoting 29 C.F.R. § 825.220(c)); *see also id.* ("[T]he ways in which an employer may interfere with FMLA benefits are not limited simply to the denial of leave."). But plaintiff has offered no evidence from which a reasonable jury could conclude that the defendants considered

her decision to take FMLA leave as a negative factor when determining not to retain her.

Beginning with the first time plaintiff took leave, there is no evidence of any action defendants took against her in response at that time. GSU retained her for the 2021–2022 academic year. Without any negative employment action, no reasonable juror could conclude that the first FMLA leave factored negatively into any employment decision in 2021. *See Ziccarelli v. Dart*, 35 F.4th 1079, 1084 (7th Cir. 2022) (requiring "harm resulting from the violation" for a FMLA claim).

Nor is there evidence to connect the first FMLA leave with plaintiff's eventual non-retention. When deciding whether to retain plaintiff in 2022, defendants examined only the work product plaintiff produced after she returned from leave. To be sure, plaintiff disputes that the defendants actually ignored her previous leave in their evaluations. If defendants had failed to adjust their performance expectations to avoid penalizing her for her time on leave, then perhaps they would have interfered with her FMLA rights. *See Pagel v. TIN Inc.*, 695 F.3d 622, 629 (7th Cir. 2012). But plaintiff has offered no evidence to that effect, and mere conjecture is not enough at this stage.

Turning to the second time plaintiff took leave, the analysis is much the same. Plaintiff took leave in winter 2022. After she had requested the leave but before her leave began, defendants decided not to retain her for the 2023–2024 academic year. But plaintiff again points to no evidence suggesting that defendants ever considered either of her decisions to take leave when they terminated her.

Plaintiff counters that the termination decisions were pretextual. But the existence of pretext is conjecture. The evidentiary record is full of evaluations and correspondence that discussed plaintiff's work—and none of them discuss her decisions to take leave as a reason not to retain her. And plaintiff does not dispute what defendants wrote.

Plaintiff does not believe that defendants depicted her work accurately in their reviews. Indeed, plaintiff submitted affidavits from some of plaintiff's prior students and other professors who viewed her work quite favorably. But none of the affidavits are from anyone involved in GSU's retention process or shed light on whether the defendants subjectively believed their own reviews. And different opinions about plaintiff's work do not create material disputes of fact regarding *defendants*' evaluation of plaintiff's work. *See Tibbs v. Administrative Office of the Ill. Courts*, 860 F.3d 502, 507 (7th Cir. 2017) ("Mere disagreement about the reasons given . . . does not support an inference of pretext."). Whether the defendants' reviews were correct is irrelevant to the court's analysis. A court does not "sit as a super-personnel department with authority to review an employer's business decision." *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 697 (7th Cir. 2006) (quoting *Ballance v. City of Springfield*, 424 F.3d 614, 621 (7th Cir. 2005)). Instead, a court's "inquiry is limited

to whether there is a material factual dispute as to whether the employer *honestly believed*" its own reasoning. *Id.* (emphasis added). Thus, merely disputing that the reviews were accurate does not create a triable issue of fact for a jury.

Finally, plaintiff points out that the second leave request was close in time to defendants' decision not to retain her. Yet the Seventh Circuit has held that mere temporal proximity is not enough to sustain a FMLA claim. *See Taylor-Novotny v. Health All. Med. Plans, Inc.*, 772 F.3d 478, 496 (7th Cir. 2014) (explaining that temporal proximity by itself "rarely is sufficient to create a triable issue"). This is not one of those rare occasions. A "case based on suspicious timing is particularly weak where a plaintiff's protected activity follows a performance warning for the very same conduct that ultimately led to her termination." *Id.* at 496 (cleaned up). Here, defendants expressed concerns about plaintiff's performance each time they decided to retain her. These concerns predate plaintiff's FMLA leave.

Simply put, plaintiff relies on conjecture and speculation in an attempt to dispute defendants' asserted facts. Neither is enough at the summary judgment stage; concrete facts are required. *See Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1127 (7th Cir. 1996) ("Speculation is insufficient to withstand summary judgment."). Since plaintiff has provided no concrete facts to support her arguments regarding defendants' intent, no jury could reasonably conclude that defendants' stated reasons were pretextual, so summary judgment on plaintiff's FMLA claims is appropriate.

## II. ADA

Next the court turns to plaintiff's two ADA claims, discrimination and retaliation. Like plaintiff's two FMLA claims, her two ADA claims are based on related facts, so they are appropriately addressed together.

The parties briefed plaintiff's discrimination claim as a failure to accommodate claim. *See* [78] at 6–8; [94-1] at 2–3; s*ee also Rodrigo v. Carle Found. Hosp.*, 879 F.3d 236, 241 (7th Cir. 2018) (citing 42 U.S.C. § 12112(b)(5)(A)) (failure to accommodate can be a form of discrimination). To establish that defendants failed to provide a reasonable accommodation, plaintiff must establish that "(1) [s]he is a qualified individual with a disability; (2) the [defendant] was aware of h[er] disability; and (3) the [defendant] failed to reasonably accommodate that disability." *Preddie*, 799 F.3d at 813. A retaliation claim requires a showing that the defendants took an adverse employment action against plaintiff because she exercised her rights under the ADA. *Cf. id.* at 814. The key question is whether the evidence, considered as a whole, would permit a reasonable jury to conclude that plaintiff's disability caused her discharge or other adverse employment action. *See Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). A common way to organize the evidence is the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Under the burden-shifting framework, plaintiff bears the initial burden to show that she engaged in statutorily protected activity; was performing her job satisfactorily; and was singled out for an adverse action that did not befall similarly situated employees who did not engage in the protected activity. *See Preddie*, 799 F.3d at 814. Even if plaintiff can establish her initial burden, defendants can still prevail at summary judgment if they can present a legitimate reason for not retaining plaintiff. *Id*. If defendants carry their burden, plaintiff must then present evidence that defendants' purported reasons are pretextual to defeat their bid for summary judgment. *Id*.

Starting with plaintiff's failure to accommodate claim, the parties dispute only whether defendants reasonably accommodated her disability. The undisputed evidence establishes that they did and no reasonable juror could conclude otherwise.

Plaintiff was disabled after the 2021 surgery. She asked to work remotely, and defendants agreed. They reassigned her to teach remote classes. Initially, this resulted in plaintiff being assigned to teach different classes (remotely) from the classes plaintiff had originally been assigned to teach (in person), because the classes plaintiff had originally been assigned had not been approved for online instruction and students had already registered for in person classes. Then Dr. Lu rearranged plaintiff's schedule in an attempt to accommodate plaintiff by offering her remote classes either that she had taught before or that had well-developed curricula.

Plaintiff argues that her originally assigned classes could be taught remotely by pointing out that other courses were taught remotely. That other classes could be taught remotely, though, does not mean plaintiff's classes could be converted to online instruction, especially so soon before the semester began. So plaintiff's evidence does not actually contradict defendants' claim. Plaintiff has failed to provide any evidence from which a jury could conclude that defendants were in fact able to adjust her classes as she preferred. But even if plaintiff was correct that her originally assigned classes could have been rescheduled to take place online, that fact would not be material. Defendants did not have to offer the best possible accommodation within their power, only a reasonable one. By offering plaintiff other classes that had been approved for online instruction, defendants provided a reasonable accommodation, even if they also had the different option of moving her originally assigned classes online and declined to do so.

Declining to move plaintiff's previously scheduled classes online was not a failure to accommodate. Although plaintiff did not prefer the newly assigned classes, employees are not entitled to their "preferred accommodation or the accommodation most beneficial to the employee." *Porter v. City of Chi.*, 700 F.3d 944, 951 (7th Cir. 2012); *e.g.*, *Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 683 (7th Cir. 2014) ("Bunn's apparent displeasure with the way in which Khoury decided on that accommodation, or with its failure to provide the exact accommodation he would have preferred, is

irrelevant."). Defendants offered plaintiff a reasonable accommodation, and that is the end of the court's inquiry. *See id*.

Nor did defendants violate the ADA by not negotiating further with plaintiff. "[T]he interactive process is not an end in itself, [so] it is not sufficient for an employee to show that an employer failed to engage in an interactive process." *Id*. (cleaned up).

Turning to the retaliation claim, the key question is whether the evidence would allow a reasonable jury to find that defendants retaliated against plaintiff because she sought accommodation for her disability. *See Ortiz*, 834 F.3d at 765. Again, *McDonnell-Douglas*' burden-shifting framework is a helpful way to organize the evidence. *See Brooks v. Avancez*, 39 F.4th 424, 433–34 (7th Cir. 2022) (applying *McDonnell-Douglas'* burden-shifting framework to an ADA retaliation claim); *Preddie*, 799 F.3d at 814. Regardless of the method used to organize the evidence, the result is the same. Plaintiff has not met (or, more precisely, shown a genuine issue of material fact as to) her ultimate burden. Even assuming that plaintiff satisfied her initial burden by providing evidence that she was performing the job satisfactorily—and the uncontroverted evidence indicates otherwise—defendants have more than satisfied their burden to establish legitimate reasons for declining to move plaintiff's original courses online or to retain plaintiff. As discussed, defendants could not move her classes online at the last minute and plaintiff offers no contradictory evidence.

Turning to defendants' ultimate decision, the undisputed evidence shows that defendants declined to retain plaintiff because they believed that she had not met the required research criteria for Year Four retention. Again, the DPC report for plaintiff's 2022 retention application showed that plaintiff continued to wrongfully list herself as the sole author of materials; failed to submit evidence that her work had been submitted to a publisher; and submitted work as proof of research when she had previously been told that the work was not appropriate evidence of research. [94-2] ¶ 63.

Plaintiff responds that her research was appropriate. But it occurred outside the relevant evaluation window, and plaintiff had already been informed that it was considered insufficient by GSU. And even assuming plaintiff was correct regarding this particular point, other undisputed evidence, including defendants' concerns that she misattributed authorship and failed to produce enough research, would still establish that defendants had other legitimate non-discriminatory reasons to decline to retain plaintiff.

Thus, the burden shifts back to plaintiff to prove that defendants' stated reasons were pretextual. Plaintiff again fails to present evidence of pretext. Plaintiff points to no communication or statement by any defendant showing that their decision to recommend not retaining her, much less the ultimate decision not to retain her, was based on her disability rather than their respective stated reasons.

Plaintiff may disagree with defendants that her performance was inadequate, but that disagreement "does not support an inference of pretext." *Tibbs*, 860 F.3d at 507. Defendants may even be wrong, but employers are allowed to be wrong without running afoul of discrimination laws. The court's role is not to step into the shoes of GSU's faculty committees but is instead limited to reviewing whether there is a genuine dispute of material fact about what the defendants honestly believed. *See Ptasznik*, 464 F.3d at 697. That review reveals no genuine or material dispute about defendants' reasons for not retaining plaintiff. Summary judgment is appropriate on plaintiff's ADA claims.

## CONCLUSION

Defendants' motion for summary judgment is granted.

Dated: September 8, 2026 <u>/s/ Martha M. Pacold</u>